Samuel M. Lasser (SBN – 252754)
slasser@edelson.com
EDELSON PC
1934 Divisadero Street
San Francisco, California 94115
Tel: 415.994.9930
Fax: 415.776.8047

Rafey S. Balabanian*
rbalabanian@edelson.com
Alexander T.H. Nguyen*
anguyen@edelson.com
Amir C. Missaghi*
amissaghi@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Pro hac vice admission to be sought.

Attorneys for Plaintiff and the Putative Classes

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| WILFORD RANEY, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>TWITTER, INC., a Delaware corporation,<br><br>*Defendant.* | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**(1)  Violations of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.*; and**<br><br>**(2)  Violations of the California Invasion of Privacy Act, Cal. Pen. Code §§ 630 *et seq.***<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Wilford Raney brings this Class Action Complaint and Demand for Jury Trial against Defendant Twitter, Inc., to stop its practice of systematically intercepting, reading, and altering the private messages of its users without their knowledge or consent. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## NATURE OF THE ACTION

1. Twitter, a popular social network, is best known for its short, public, 140-character messages called "tweets." Twitter users "follow" and are "followed" by other Twitter users, and write, read, and share tweets about politics, pop culture, sports, and more.

2. Twitter also operates a purportedly private (and non-public) "Direct Message" service. Twitter represents that its users can "talk privately" through these Direct Messages, which "can only be seen between the people included."[1]

3. In reality, and despite these representations, Twitter surreptitiously eavesdrops on its users' private Direct Message communications. As soon as a user sends a Direct Message, Twitter intercepts, reads, and, at times, even alters the message. For example, should a user write a Direct Message and include a hyperlink (*i.e.*, a link to a website such as www.nytimes.com), Twitter's algorithms will read through the Direct Message, identify the hyperlink, and replace it with its own custom link, thereby sending the person clicking on the link to Twitter's analytics servers before passing them on to the original linked-to website.

4. Twitter benefits immensely from replacing user hyperlinks with its own. For instance, Twitter increases its perceived value to third-party websites and would-be advertisers. That is, in the example given, the *New York Times* would identify Twitter as the source of internet traffic, whereas without replacing the link the source would be anonymous. The end result is that Twitter can negotiate better advertising rates.

5. But while Twitter reads the contents of its users' private Direct Messages,

---

[1] *About Direct Messages*, about.twitter.com/directmessages (last visited Sept. 4, 2015).

1   Twitter never obtains (or even seeks) its users' consent. As such, and as a result of Twitter's

2   unlawful and continuing privacy violations, Plaintiff brings suit individually and on behalf of

3   all others similarly situated to enjoin Twitter's unlawful conduct and to seek redress and

4   statutory damages under the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et*

5   *seq.* (the "ECPA"), and the California Invasion of Privacy Act, California Penal Code §§ 630

6   *et seq.* ("CIPA").

**PARTIES**

8       6.      Plaintiff Wilford Raney is a natural person and citizen and resident of the

9   State of Texas.

10      7.      Defendant Twitter, Inc., is a citizen and corporation incorporated in and

11  existing under the laws of the State of Delaware, with its principal place of business located

12  at 1355 Market Street, Suite 900, San Francisco, California 94103. Twitter does business

13  throughout this District, the State of California, and the United States.

**JURISDICTION AND VENUE**

15      8.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this

16  action arises under the ECPA, a federal statute. This Court also has diversity jurisdiction over

17  this action pursuant to 28 U.S.C. § 1332(d)(2) because (a) at least one member of each of the

18  putative Classes is a citizen of a state different from Defendant, (b) the amount in

19  controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the

20  exceptions under the subsection apply to this action.

21      9.      This Court has personal jurisdiction over Defendant because it is

22  headquartered in this District, conducts significant business in this District, and the unlawful

23  conduct alleged in this Complaint occurred in and emanated from this District.

24      10.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant

25  maintains its headquarters and principal place of business in this District and a substantial

26  part of the events giving rise to Plaintiff's Complaint occurred in this District. Venue is also

27  proper in this District because Defendant's Twitter Terms of Service state that "[a]ll claims,

28  legal proceedings or litigation arising in connection with the Services will be brought solely

in the federal or state courts located in San Francisco County, California."[2]

## INTRADISTRICT ASSIGNMENT

11.  Pursuant to Civil Local Rule 3-2(d), this case should be assigned to the San Francisco Division.

## CHOICE OF LAW

12.  California law governs the substantive legal issues in the instant matter. Defendant's Twitter Terms of Service state that "[t]hese Terms and any action related thereto will be governed by the laws of the State of California without regard to or application of its conflict of law provisions or your state or country of residence."[3] Twitter's conduct at issue herein also occurred in California.

## FACTUAL BACKGROUND

### I.  An Introduction to Twitter and its Communications Platform.

13.  Twitter owns and operates the social network where users create, read, and share short, 140-character messages called "tweets." Started in 2006, Twitter has grown to enormous proportions, with over one billion registered users and 316 million active users who collectively transmit over a half-billion tweets per day.

14.  To begin using Twitter, a consumer selects a unique Twitter username, provides contact information, and agrees to Defendant's Twitter Terms of Service. After that, the Twitter user is invited to begin "following" other Twitter users to see tweets and to begin writing their own tweets, which are public by default.

15.  Twitter makes tweets public as a policy and as a business model. Its mission is "[t]o give everyone the power to create and share ideas and information instantly, without barriers."[4] Public tweets also let Twitter track what issues are being tweeted (*e.g.,* what issues are trending), who follows whom, and more. Twitter compiles this information, adds to it from third-party sources, and builds digital profiles of its users' likes and dislikes, to sell

---

[2]      A true and accurate copy of Defendant's Twitter Terms of Service is attached hereto as Exhibit A.
[3]      *Id.*
[4]      *About the Company*, https://about.twitter.com/company (last visited Sept. 4, 2015).

1   advertisements targeting specific types of users or even specific individuals.

2       16.    Indeed, Twitter monitors which people, companies, and other Twitter

3   personalities its users follow and makes inferences about such users' interests (*e.g.*, Twitter

4   may infer that someone following Ford Motor Company's Twitter account may have an

5   interest in cars and trucks). And Twitter reads the contents of public tweets to identify

6   specific keywords and phrases, and to determine the "sentiment" of the tweet.[5] As part of its

7   advertising service, Twitter searches for "keywords in [a user's] search queries, recent

8   Tweets, and Tweets they recently engaged with."[6] If a keyword is found, Twitter might show

9   the user a relevant ad.[7]

10      17.    Beyond keywords and sentiment, Twitter also monitors tweets for hyperlinks

11  (*i.e.*, a link to a website, such as www.nytimes.com). Roughly one-third of all tweets (over

12  150,000,000 tweets per day) contain hyperlinks to other websites.[8] The sheer number of

13  tweets sent and read by Twitter users means that Twitter is responsible for generating a large

14  amount of internet traffic for other websites, with many of those sites generating revenue

15  from advertisements shown to their visitors. An increase in visitors causes an increase in

16  revenue for the target websites, making internet traffic the "currency" of the web.[9]

17      18.    Unfortunately for Twitter, normal hyperlinks do not always tell website

18  owners where their traffic comes from (the "referrer"). Consequently, at one time, there was

19  no uniform way to measure Twitter's website referral influence, meaning Twitter's

20  advertising partners could not readily measure the payoff from marketing to Twitter's users.

21  _____

22  [5]    Twitter's "sentiment monitoring technology" "filter[s] out English language Tweets with negative sentiment so [marketing] messages are only shown to the most receptive users." As a result, if a user "tweets that they're hungry but hates burritos," they "won't

23  immediately be presented with a Promoted Tweet from Taco Bell, as an example." *Twitter Makes Words in Tweets Available for Ad Targeting | Adweek*, www.adweek.com/

24  news/technology/twitter-looks-emulate-google-keyword-ad-targeting-148646 (last visited Sept. 3, 2015).

25  [6]    *Keyword Targeting | Twitter for Business*, business.twitter.com/help/keyword-targeting (last visited Sept. 14, 2015).

26  [7]    *Id.*
    [8]    *How Do People Use Twitter? [Infographic]*, blog.hubspot.com/marketing/twitter-

27  usage-stats (last visited Sept. 14, 2015).
    [9]    George Ivie, *The Viewable Impression: The First Step To An Audience-Based Digital

28  Currency 03/23/2015*, www.mediapost.com/publications/article/246125/the-viewable-impression-the-first-step-to-an-audi.html (last visited Sept. 14, 2015).

1  Worse, Twitter users invariably used "link shortening" services from other companies to

2  meet Twitter's 140-character limit on public tweets, effectively giving those other companies

3  the referral credits and analytics that Twitter itself might otherwise have enjoyed.[10]

4      19.    To rectify this lack of recognition, Twitter developed a "link service" that

5  replaces any link found in a tweet with a new hyperlink to "www.t.co," a website owned and

6  operated by Twitter. For example, Twitter changes links like "www.nytimes.com" to links

7  like "http:/t.co/CL2SKBxr1s" (while still displaying the text "www.nytimes.com" to its

8  users). Should someone click on this new link (http:/t.co/CL2SKBxr1s), they would first be

9  taken to Twitter's "t.co" website and then forwarded to the original "www.nytimes.com"

10  website. The mechanics of this redirection would ensure that the *New York Times* could see

11  that the visit came from Twitter. As a consequence, the *New York Times* would view Twitter

12  as a more valuable source of online traffic.

13      20.    When Twitter released its link service, those in the industry took note. Before,

14  "it was impossible to truly measure the impact Twitter brought through referrals."[11] But with

15  the link service, Twitter was "recognized as a hugely influential source of social media

16  traffic."[12] Others stated that "[p]reviously, it was challenging to get accurate clickthrough

17  metrics across multiple URL shorteners . . . beyond simple referral metrics in your web

18  analytics package. In addition, there was no easy and consistent method to measure outbound

19  link sharing using the Twitter widgets. . . . Moving forward, it's likely that Twitter will

20  continue to expand their analytics tools, and potentially even explore paid measurement and

21

22

---

23  [10]    As the name implies, "link shortening" means converting long hyperlinks (*e.g.*, links over 30 characters) to short ones (*e.g.*, links with about 15 characters). Companies providing

24  link shortening services are able to "track how effectively [] links work," "understand[] what people are linking to and clicking on right now," and get recognition for referring online

25  traffic. *Is there any money in making URLs shorter? | Technology | The Guardian*, www. theguardian.com/technology/2009/aug/12/url-shortener-trim-bitly (last visited Sept. 14,

26  2015).
    [11]    *Twitter Just Got the Respect it Deserves*, thenextweb.com/twitter/2011/08/21/twitter-

27  just-got-the-respect-it-deserves (last visited Sept. 14, 2015).
    [12]    *Id.*; *see also Twitter Launches New Analytics Tool to Justify Itself | Windy City*

28  *Strategies*, http://www.windycitystrategies.com/blog/twitter-launches-new-analytics-tool-to-justify-itself-002807 (last visited Sept. 14, 2015).

engagement products for business."[13]

21.     In addition, Twitter maintains a webpage providing answers to "frequently asked questions" about its link service, where it states:

"Why does Twitter have its own link [service]?

1.     Shortened links allow you to share long URLs in a Tweet while maintaining the maximum number of characters for your message.

2.     Our link service measures information such as how many times a link has been clicked, which is an important quality signal in determining how relevant and interesting each Tweet is when compared to similar Tweets.

3.     Having a link shortener protects users from malicious sites that engage in spreading malware, phishing attacks, and other harmful activity. A link converted by Twitter's link service is checked against a list of potentially dangerous sites. Users are warned with the error message below when clicking on potentially harmful URLs."[14]

22.     Besides the increase in referral recognition (which Twitter does not mention), it is the second point that generates the greatest benefit for Twitter.[15] Through its link service, Twitter can "determin[e] how relevant and interesting each Tweet is compared to similar Tweets." Twitter can ostensibly collect more information about its users by replacing every link in a tweet, tracking the websites its users share, and figuring out how they interact. Such information reveals valuable details about each user's interests, relationships, and relative levels of social influence—"important quality signals" that Twitter can (and likely does) monetize.

23.     But while Twitter acknowledges and publicizes that it replaces hyperlinks found with *tweets*, it does not disclose that it looks for and replaces hyperlinks in *private direct messages*. On the contrary, Twitter represents that the private messages it offers, called "Direct Messages," are readable only by the sender and the recipients. Yet, a close look at the

---

[13]     *Twitter Launches New Web Analytics Dashboard | Klick Health*, www.klick.com/health/ news/blog/twitter-launches-new-web-analytics-dashboard/ (last visited Sept. 14, 2015).

[14]     *About Twitter's link service (http://t.co) | Twitter Help Center*, support.twitter.com/ articles/109623 (last visited Sept. 14, 2015).

[15]     The first point—that "[s]hortened links allow you to share long URLs in a Tweet while maintaining the maximum number of characters for your message"—is inapplicable to Direct Messages, which do not have character limitations. And the third—that links are "checked against a list of potentially dangerous sites"—is likewise inapplicable, as checking against a list in no way requires a link to be converted.

Direct Message service reveals that Twitter intercepts and reads contents of every message to, *inter alia*, find hyperlinks that it can replace with its own "t.co" links.

**II.** **Twitter Represents that Direct Messages are Private but in Reality Reads the Contents of Each One Without Consent.**

24.     Recognizing that its users may want to share information privately, Twitter created the "Direct Message" system. According to Twitter's representations, Direct Messages (as opposed to public tweets) allow users to write communications that will only be accessible and read by the sender and the recipients. Despite those representations, Twitter reads the contents of every Direct Message *while in transit* to, at the least, identify and modify hyperlinks.

*A.    Twitter Expressly Represents that Direct Messages are Private.*

25.     Twitter advertises its Direct Message service as an alternative to a public tweet. Rather than requiring users to send messages publicly to all their followers, like with tweets, Direct Messages allow users to transmit private messages directly to selected recipients. Twitter programmed its service to display certain text to Direct Message users emphasizing that they can "[t]alk privately." For example, Twitter displays the following when a user opens the Direct Message service for the very first time through a web browser:



(**Figure 1**, showing representations from Twitter's web browser interface.)

26.     Twitter makes similar representations when users first access the Direct Message system through iOS (*e.g.*, Apple iPhone and iPad) or Android (*e.g.*, Samsung Galaxy S) devices:



(**Figure 2**, showing representations from Twitter's iOS interface.)

(**Figure 3**, showing representations from Twitter's Android interface, inviting users to "Talk privately with anyone who follows you.")

27.     Elsewhere, Twitter represents that "Direct Messages are the private side of Twitter. [Twitter users] can use Direct Messages to have private conversations with Twitter users about Tweets and other content."[16] "While Twitter is largely a public experience, Direct Messages let [Twitter users] have private conversations about the memes, news, movements, and events that unfold on Twitter."[17] "With Direct Messages on Twitter, [users] can communicate privately."[18] "*Direct messages can only be seen between the people included*"[19] [emphasis added].

28.     Twitter expressly represents that Direct Messages are private messages. Twitter users necessarily rely on these representations to form the understanding that Direct Messages let them communicate privately, as opposed to publicly through public tweets. Without this understanding, Twitter users would have no reason to use Direct Messages instead of public tweets. As such, Twitter users reasonably expect that their Direct Messages will be kept private during transmission. Nonetheless, unbeknownst to them, Twitter intercepts and reads the contents of every Direct Message.

---

[16]     *About Direct Messages | Twitter Help Center*, support.twitter.com/articles/14606 (last visited Sept. 14, 2015).
[17]     *Removing the 140-character limit from Direct Messages | Twitter Blogs*, blog.twitter.com /2015/removing-the-140-character-limit-from-direct-messages (last visited Sept. 14, 2015).
[18]     *About Direct Messages*, *supra*.
[19]     *Id.*

*B.* *Twitter Intercepts and Reads the Contents of Every Direct Message During Transmission.*

29. Contrary to Twitter's representations, Direct Messages are not private. Instead, Twitter intercepts and reads the contents of each Direct Message while the message is in transit (*i.e.*, immediately after it is sent but before it is received). Moreover, Twitter actively monitors Direct Messages for hyperlinks that can supplement its link service. But while Twitter reads, monitors, and, at times, alters Direct Messages, Twitter never obtains its users' consent to do so.

30. From a Twitter user's perspective, sending a Direct Message is a simple task. The user navigates to the Direct Message system (after viewing Twitter's privacy-related representations, discussed above) and specifies to whom the Direct Message will be sent. After selecting the recipient or recipients, the user drafts a message and clicks on a "Send" button to transmit the message.

31. But before Twitter delivers the message to the intended recipient, Twitter intercepts and accesses the contents of the message. The moment the consumer clicks "Send," Twitter's service will open, scan, and potentially alter the contents of the message.

32. Twitter's invasive scanning is demonstrated by its practice of altering the contents of hyperlinks. Should a Twitter user transmit a Direct Message with a hyperlink, Twitter automatically uses its link service, described above, to replace the hyperlink with its own referral link. This link replacement happens instantaneously during transit and is hidden from both the sender and recipient.

33. Indeed, to the sender of the message, his or her Direct Message looks unadulterated. For example, Figures 4 through 9 show Twitter's user interface for drafting and transmitting a Direct Message. First, in Figure 4, Twitter invites the user to "Talk privately" by clicking on a button that says "Send a Direct Message":



(**Figure 4.**)

34.     Next, as shown in Figures 5 and 6, Twitter asks the user to "Enter a name" of at least one other Twitter user who will receive the message.




(**Figure 5.**)                                    (**Figure 6**, showing redacted Twitter name.)

35.     Once the user specifies a recipient, Twitter instructs the user to "Start a new message" by typing into a box at the bottom. *See* Figure 7.

1
2
3
4
5
6
7
8
9
10
11

(**Figure 7.**)

12

36.     In the example shown, the user drafted a message containing a link to

13

www.nytimes.com, *see* Figure 8, and then pressed the "Send" button to transmit the message

14

to the recipient. *See* Figure 9.

15
16
17
18
19
20
21
22
23
24



(**Figure 8.**)



(**Figure 9.**)

25

37.     As Figure 9 shows, the transmitted Direct Message appears to contain the

26

same hyperlink to "nytimes.com" that the user had originally sent.

27

38.     Behind the scenes, however, it is evident that Twitter intercepted and read the

28

message, identified the hyperlink, and tampered with the message by replacing the hyperlink

with its own "t.co" link. Specifically, the computer code for Twitter.com used to display the interface as shown in <u>Figure 9</u> reveals that the "display" link (circled in green) is programmed to match what the user sent (*i.e.*, nytimes.com) but the underlying hyperlink (circled in red) is modified from "www.nytimes.com" to "http://t.co/36rtdx2c1M." *See* <u>Figure 10</u>.



(**Figure 10**, showing an example of Twitter's underlying computer code.)

39.    Twitter displays "nytimes.com" instead of the "t.co" hyperlink because it understands that consumers might be weary of clicking on indecipherable hyperlinks (*e.g.*, t.co/36rtdx2c1M). That is, Twitter knows that users are unable to discern that the hyperlink "t.co/36rtdx2c1M" will navigate them to nytimes.com. To resolve this, Twitter masks its "t.co" hyperlink with the original nytimes.com link. The recipient of the Direct Message, then, is more likely to click on this familiar-looking hyperlink.

40.    When a Twitter user clicks on the masked hyperlink, Twitter receives a benefit in the form of referral credit. In the example provided, while both hyperlinks ultimately navigate users to nytimes.com, the first—which connects *directly* to "www.nytimes.com"—will not generate referral credit for Twitter. Conversely, the second, masked link, which reroutes users to Twitter's own "t.co" website before nytimes.com, will generate referral credit for Twitter. Thus, Twitter's masked "t.co" link lets the *New York Times* identify Twitter as the referrer of its web traffic, increasing the perceived value of marketing through Twitter.

41.    In addition, Twitter benefits by tracking and generating analytics from users that click on its replaced hyperlinks. As explained above, Twitter reads the contents of all Direct Messages so that it can identify and replace hyperlinks with its own, routing every user who clicks to Twitter's "t.co" website. Twitter then tracks each "t.co" visitor (voluntary or not) through the use of "cookie" technology; where cookies are simple text files placed

onto a user's computer by a web server (*e.g.*, Twitter's "t.co") that can be used to track browsing activity and report said activity back to the server that originally placed the cookie.

42.     Twitter uses cookies, such as the "t.co" cookie, not only to track users as they connect to its own websites, but also as they surf the web. Indeed, Twitter partners with website operators to include "tweet this" buttons on their websites, shown in <u>Figure 11</u>, that expand Twitter's tracking and analytics capabilities.



(**Figure 11.**)

43.     Every website with a "tweet this" button reports back to Twitter with information on the site's visitors, allowing Twitter's analytics to span the internet. One internet publication described Twitter's tracking:

> "Basically, every time you visit a site that has a follow button, a 'tweet this' button … Twitter is recording your behavior. It is transparently watching your movements and storing them somewhere for later use. … The privacy implications of such behavior by a company so large are sweeping and absolute."[20]

44.     Twitter's replacement of hyperlinks in private Direct Messages demonstrates that Twitter intercepts and reads the contents of every Direct Message, and it receives several benefits from this practice—including the ability to track users based on information they would not reveal publicly through default tweets. Yet, Twitter never obtains its users' consent. As such, Defendant's methods disregard consumers' privacy rights and violate federal and state law.

**FACTS RELATING TO PLAINTIFF WILFORD RANEY**

45.     Plaintiff Wilford Raney registered for a Twitter account in 2009, at which time he agreed to Defendant's Twitter Terms of Service. Since then, Plaintiff has publicly tweeted more than 200,000 times from his personal computer and his smartphone.

46.     Plaintiff has also sent and received hundreds of Direct Messages, both from

---

[20]     *Twitter Is Tracking You On The Web; Here's What You Can Do To Stop It*, http://lifehacker.com/5911389/twitter-is-tracking-you-on-the-web-heres-what-you-can-do-to-stop-it (last visited Sept. 14, 2015).

his personal computer and smartphone, including more than a dozen in the past twelve months. Unbeknownst to Plaintiff (and without his consent), Twitter intercepted and read the contents of all of his private Direct Messages. For instance, Twitter read Plaintiff's Direct Messages to identify hyperlinks to other websites so that it could replace identified links with its own "t.co" hyperlinks.

47. Plaintiff also received many Direct Messages, including messages containing hyperlinks replaced by Twitter. When Plaintiff clicked on links from those Direct Messages, he was surreptitiously rerouted through Twitter's servers without his knowledge or consent.

48. At no time did Plaintiff consent to Twitter's interception, reading, monitoring, or alteration of the contents of the Direct Messages he sent or received.

## CLASS ALLEGATIONS

49. Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and (3) on behalf of himself and two Classes of similarly situated individuals, defined as follows:

> **Sender Class**: All individuals in the United States who sent one or more Direct Message where Twitter was not a party to the message.

> **Recipient Class**: All individuals in the United States who received one or Direct Message where Twitter was not a party to the message.

Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers, and directors; (3) counsel for Plaintiff and Defendant; (4) persons who properly execute and file a timely request for exclusion from the classes; (5) the legal representatives, successors, or assigns of any such excluded persons; and (6) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims against Defendant.

50. **Numerosity**: The exact number of members in each Class is unknown to Plaintiff at this time, but on information and belief, there are tens of thousands of people in each of the Classes, making joinder of each individual member impracticable. Ultimately, members of the Classes will be easily identified through Defendant's records.

51.     **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the other members of the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include but are not limited to the following:

(a)     whether Twitter obtained consent to intercept and/or access Plaintiff's and the Classes' Direct Messages;

(b)     whether Twitter intercepted and/or read Plaintiff's and the Classes' Direct Messages;

(c)     whether Twitter used the contents of Plaintiff's and the Classes' Direct Messages for its benefit;

(d)     whether Twitter's conduct violates the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq*.;

(e)     whether Twitter's conduct violates the California Invasion of Privacy Act, Cal. Pen. Code §§ 630, *et seq*.; and

(f)     whether Plaintiff and the members of the Classes are entitled to actual and/or statutory damages as a result of Twitter's conduct.

52.     **Typicality**: Plaintiff's claims are typical of the claims of all the other members of the Classes. Plaintiff and the members of the Classes sustained substantially similar damages as a result of Defendant's uniform wrongful conduct, based upon the same interactions that were made uniformly with Plaintiff and the public.

53.     **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the other members of the Classes. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Classes.

54.     **Policies Generally Applicable to the Classes**: Defendant has acted and failed to act on grounds generally applicable to Plaintiff and the other members of the Classes, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct

1  toward the Classes.

2      55.  **Superiority**: This case is also appropriate for class certification because class

3  proceedings are superior to all other available methods for the fair and efficient adjudication

4  of this controversy as joinder of all parties is impracticable. The damages suffered by the

5  individual members of the Classes will likely be relatively small, especially given the burden

6  and expense of individual prosecution of the complex litigation necessitated by Defendant's

7  actions. Thus, it would be virtually impossible for the individual members of the Classes to

8  obtain effective relief from Defendant's misconduct. Even if members of the Classes could

9  sustain such individual litigation, it would still not be preferable to a class action, because

10 individual litigation would increase the delay and expense to all parties due to the complex

11 legal and factual controversies presented in this Complaint. By contrast, a class action

12 presents far fewer management difficulties and provides the benefits of single adjudication,

13 economies of scale, and comprehensive supervision by a single Court. Economies of time,

14 effort, and expense will be fostered and uniformity of decisions ensured.

15     56.  Plaintiff reserves the right to revise the Class Definitions and Class

16 Allegations based on further investigation, including facts learned in discovery.

### FIRST CAUSE OF ACTION
**Violations of the Electronic Communications Privacy Act**
**18 U.S.C. §§ 2510 *et seq.***
**(On Behalf of Plaintiff and the Classes)**

17     57.  Plaintiff incorporates by reference the foregoing allegations.

18     58.  The Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.* (the

"ECPA"), prohibits any person from intentionally intercepting any electronic communication

or from intentionally using, or endeavoring to use, the contents of any electronic

communication while knowing or having reason to know that the information was obtained

through the interception of an electronic communication. 18 U.S.C. § 2511(1)(a), (d).

     59.  Twitter, as a corporation, is a "person" under the ECPA, which is broadly

defined to include "any individual, partnership, association, joint stock company, trust, or

corporation." 18 U.S.C. § 2510(6).

60.     Direct Messages are "electronic communications" under the ECPA, which are broadly defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectric or photooptical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

61.     Plaintiff and the members of the Classes sent or received "electronic communications" while using Defendant Twitter's services whenever they sent or received Direct Messages through such services.

62.     Twitter intercepted, read, and/or used the Direct Messages sent or received by Plaintiff and each member of the Classes between the time each such message was sent, on the one hand, and the time such message was posted to a recipient's inbox, on the other. In doing so, Twitter used electronic, mechanical, or other devices to automatically acquire, read, and manipulate content from Direct Messages in the course of each such message's transmission.

63.     Twitter intentionally used, or endeavored to use, the contents of these Direct Messages while knowing or having reason to know that the information was obtained through the interception of an electronic communication.

64.     Twitter's actions as complained of herein have been intentional, as evidenced by the design and implementation of its Direct Message service.

65.     Twitter's interception, reading, and altering of Direct Messages are not necessary practices for providers of electronic communication services, nor are they instrumental or necessary to the operation of a functioning Direct Messaging system to the transmission of Direct Messages. Specifically, it is not necessary for Twitter to identify and replace hyperlinks with its own t.co links to transmit the Direct Messages or to protect against malicious messages. As described in Section I, Twitter states that analytics (*e.g.*, "measure[ing] information such as how many times a link has been clicked") is a separate process from purported protections against malicious hyperlinks.

66.     No party to the electronic communications alleged herein consented to

Twitter's interception or use of the contents of the electronic communications. Nor could they, because Twitter never sought to obtain its users' consent, and each interception occurred immediately after the sending of a Direct Message, before the recipient (or sender) could provide consent (if any was sought). Moreover, Twitter was never a party to any of the messages sent and/or received by Plaintiff and members of the Classes.

67.     Plaintiff and the Classes suffered harm as a result of Defendant's violations of the ECPA, and therefore seek (a) preliminary, equitable and declaratory relief as may be appropriate, (b) the sum of the actual damages suffered and the profits obtained by Defendant as a result of its unlawful conduct, or statutory damages as authorized by 18 U.S.C. § 2520(2)(B), whichever is greater, (c) punitive damages, and (d) reasonable costs and attorneys' fees.

**SECOND CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act**
**Cal. Pen. Code §§ 630, *et seq*.**
**(On Behalf of Plaintiff and the Classes)**

68.     Plaintiff incorporates by reference the foregoing allegations.

69.     The California Invasion of Privacy Act, Cal. Pen. Code §§ 630, *et seq*. (the "CIPA"), provides that "The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."

70.     Plaintiff and the members of the Classes sent and received private Direct Messages through Twitter's services.

71.     California Penal Code § 631(a) prohibits "[a]ny person" from "willfully and without consent of all parties to the communication, or in any unauthorized manner, read[ing], or attempt[ing] to read, or [] learn[ing] the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable"

1    or from "us[ing], or attempt[ing] to use" such communications.

2        72.    Pursuant to California Penal Code § 7, Twitter, a corporation, is a "person."

3        73.    Twitter acts willfully when it reads, attempts to read, or learns the content or

4    meaning of the private Direct Messages sent and received by Plaintiff and the members of

5    the Classes.

6        74.    Twitter does not have the consent of any party to the communication, or it acts

7    in an unauthorized manner, when it reads, attempts to read, or learns the content or meaning

8    of the private Direct Messages sent and received by Plaintiff and the members of the Classes

9    or when it uses or attempts to use the contents of those communications.

10       75.    At the time Twitter reads, attempts to read, or learns the content or meaning of

11   the private Direct Messages sent and received by Plaintiff and the members of the Classes,

12   the messages are in transit, in that Twitter intercepts and scans such messages after they have

13   been sent but before they have been posted to any recipient's inbox.

14       76.    At the time Twitter reads, attempts to read, or learns the content or meaning of

15   the private Direct Messages sent and received by Plaintiff and the members of the Classes,

16   such messages are in transit or are passing over a wire, line, or cable. Specifically, Twitter

17   intercepts and scans the content of private Direct Messages while such messages are still in

18   transit, after having been sent from one user but before being received by any other user or

19   his or her account.

20       77.    Plaintiff and the members of the Classes do not consent, expressly or

21   impliedly, to Twitter's eavesdropping upon and recording of their private messages. Twitter

22   does not disclose material information to its users relating to its attempts at, among other

23   things, intercepting, reading, and altering the contents of its users' private Direct Messages.

24       78.    Plaintiff and the members of the Classes do not know or expect that Twitter

25   reads their private Direct Messages and/or learns of and manipulates the contents therein.

26   Twitter's actions extend beyond the normal occurrences, requirements, and expectations

27   regarding the transmission of private Direct Messages.

28       79.    Pursuant to Cal. Penal Code Section 637.2, Plaintiff seeks an order: (i)

---

CLASS ACTION COMPLAINT                    20                    CASE NO.

requiring Defendant to cease the unlawful practices described herein; (ii) awarding statutory
damages of $5,000 to each member of the Classes; and (iii) awarding reasonable costs and
attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Wilford Raney, individually and on behalf of the Classes,
prays for the following relief:

A.  Certify this case as a class action on behalf of the Classes defined above,
appoint Wilford Raney as representative for the Classes, and appoint his counsel as counsel
for the Classes;

B.  Declare that Defendant's actions, as described herein, violate the Electronic
Communications Privacy Act (18 U.S.C. §§ 2510 *et seq.*) and the California Invasion of
Privacy Act (Cal. Penal Code §§ 630 *et seq.*);

C.  Award injunctive and other equitable relief as is necessary to protect the
interests of Plaintiff and the members of the Classes, including, *inter alia*, an order
prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

D.  Award damages, including:

    i.  the greater of (a) the sum of actual damages suffered plus any profits
Defendant earned through its unlawful conduct, and (b) the greater of
$100 per member of the Classes, per day of Defendant's violations, or
$10,000 per member of the Classes, pursuant to 18 U.S.C.
§ 2520(c)(2);

    ii.  statutory damages of $5,000 per Class member, pursuant to Cal. Pen.
Code § 637.2; and

    iii.  punitive damages, where applicable, to Plaintiff and the Classes in an
amount to be determined at trial;

E.  Award Plaintiff and members of the Classes their reasonable litigation
expenses and attorney's fees;

F.  Award Plaintiff and members of the Classes pre- and post-judgment interest,

1   to the extent allowable; and

2      G.  Award such other and further relief as equity and justice may require.

3   **JURY TRIAL**

4     Plaintiff demands a trial by jury for all issues so triable.

5

6        Respectfully submitted,

7   Dated: September 14, 2015   **WILFORD RANEY**, individually and on

8        behalf of all others similarly situated,

9        By: /s/ Samuel M. Lasser

10        One of Plaintiff's Attorneys

11       Samuel M. Lasser
         slasser@edelson.com

12       EDELSON PC
         1934 Divisadero Street

13       San Francisco, California 94115
         Tel: 415.994.9930

14       Fax: 415.776.8047

15       Rafey S. Balabanian*
         rbalabanian@edelson.com

16       Alexander T.H. Nguyen*
         anguyen@edelson.com

17       Amir C. Missaghi*
         amissaghi@edelson.com

18       EDELSON PC
         350 North LaSalle Street, Suite 1300

19       Chicago, Illinois 60654
         Tel: 312.589.6370

20       Fax: 312.589.6378

21       *Pro hac vice* admission to be sought.

22       *Attorneys for Plaintiff and the Putative*
         *Classes*

23

24

25

26

27

28

---

CLASS ACTION COMPLAINT    22    CASE NO.